UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAILIAN OVERSEAS CONSULTING GROUP, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK CITY REGIONAL CENTER LLC,<br><br>Defendant. | Civil Action No. 17-cv- 9004<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Wailian Overseas Consulting Group, Ltd. ("Wailian"), by and through its counsel Kasowitz Benson Torres LLP, as and for its complaint against New York City Regional Center LLC ("NYCRC"), alleges as follows:

### NATURE OF THE CASE

1. This is an action for breach of contract and unjust enrichment arising out of NYCRC's repudiation and breach of its obligations to pay Wailian more than $9 million.

2. Wailian is a leading immigration agency, which promotes to Chinese investors U.S.-based investment projects offered in connection with the EB-5 visa program. That program allows foreign nationals who invest in such projects to become lawful permanent residents of the United States.

3. NYCRC is a regional center that provides financing for EB-5 program projects in New York City. In November 2009, NYCRC and Wailian entered into a Referral Agreement by which NYCRC engaged Wailian as a referral agent. Pursuant to the Referral Agreement and subsequent "Schedule A" agreements for each project, Wailian referred to NYCRC qualified foreign investors to invest in specific EB-5 projects. In return, NYCRC agreed to compensate

Wailian for each approved investor, including by making "annual payments" to Wailian, payable on the first five anniversaries of the approval of each investor's immigration petition.

4. Wailian and NYCRC collaborated on a total of eight EB-5 projects between 2009 and 2012. Wailian fully performed its obligations to NYCRC, referring hundreds of investors and hundreds of millions of dollars to NYCRC projects, which also generated tens of millions of dollars of income for NYCRC itself.

5. Though NYCRC sought, received, and accepted Wailian's performance and the large benefits flowing therefrom, NYCRC has knowingly, intentionally, and wrongly failed to pay Wailian the monies it is due under the parties' agreements. NYCRC was in regular communication with Wailian, but NYCRC never stated or implied that it would not make the required annual payments under the Referral Agreement and related Schedule A agreements.

6. To date, despite Wailian's repeated demands, NYCRC has not made a single annual payment to Wailian. Wailian brings this action to recover the more than $9 million in fees owed by NYCRC, plus interest, costs, and attorney fees.

**PARTIES**

7. Plaintiff Wailian is a British Virgin Islands corporation with its principal place of business in Shanghai, China.

8. Defendant NYCRC is a New York limited liability company with its principal place of business at 99 Hudson Street, New York, New York.

**JURISDICTION AND VENUE**

9. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332. This action is between citizens or subjects of this State and a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over NYCRC by virtue of its business activities within the State of New York and this Judicial District, including its maintenance of offices within the State, its numerous contacts with this jurisdiction, and its conduct of business in this State, including in connection with the disputes that are the subject of this action. Additionally, pursuant to the parties' agreement, NYCRC has submitted to this Court's jurisdiction for purposes of the enforcement of the Referral Agreement and the schedules thereto.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because NYCRC resides in this District. Venue is also proper pursuant to the parties' agreement to submit to the jurisdiction of the courts in this Judicial District.

## FACTS

### I. THE EB-5 IMMIGRANT INVESTOR PROGRAM

12. The EB-5 program is a U.S. Customs and Immigration Service ("USCIS") visa program that allows foreign nationals who invest in approved commercial projects to obtain green cards and become lawful permanent residents of the United States.

13. Wailian is a leading immigration agent that identifies, recruits, and refers to regional centers, including NYCRC, foreign investors who are able to invest substantial sums of money in EB-5 program projects.

14. To qualify for an EB-5 visa, foreign investors must meet certain investment and immigration criteria. Investors must invest a specified amount (usually $500,000 or $1 million) into a qualified project and usually do so through USCIS-approved "regional centers," such as NYCRC. Regional centers administer EB-5 projects, directing foreign investment to specific projects and overseeing both the investments and the projects' compliance with EB-5 program requirements. In addition to their investments, investors must also apply, and satisfy the requirements, for a green card.

15. Established in 2008, NYCRC is a regional center that provides capital for real estate and infrastructure projects in New York City. NYCRC directs EB-5 investments to special purpose financing vehicles that it organizes and administers for each individual project (each a "Fund").

## II. WAILIAN CONTRACTS WITH NYCRC AND REFERS HUNDREDS OF MILLIONS OF DOLLARS TO NYCRC PROJECTS

### A. The Parties' Contracts

16. From 2009 through 2012, Wailian referred a total of more than 460 EB-5 investors to NYCRC to invest in eight projects (each a "Project" and, collectively, the "Projects"), raising for NYCRC a total of nearly $250 million.

17. The parties' relationship was governed by a Referral Agreement between NYCRC and Wailian dated as of November 6, 2009 (the "Referral Agreement") and by subsequent "Schedule A" agreements executed in connection with each individual Project, as provided in the Referral Agreement.

18. The Referral Agreement provides for Wailian to refer qualified foreign investors to NYCRC to invest in Funds, which then invest in qualified EB-5 projects. In return, NYCRC is obligated to pay Wailian for each referred investor approved by NYCRC, as specified in the Schedule A for each Project.

19. Among other things, the Schedule A's provide for NYCRC to make annual payments to Wailian for five years on the anniversary of each investor's green card petition approval, subject to certain conditions.

20. In addition to payment terms, the Schedule A's generally set forth the "allocation," that is, number of investors, that NYCRC guarantees to Wailian for each Project, along with a date for Wailian to deliver investor funds and applications.

21. NYCRC unilaterally drafted the Referral Agreement and all of the Schedule A's. Wailian did not participate in the negotiation or drafting of the Referral Agreement or of any of the Schedule A's. As set forth below, the Schedule A's were frequently modified, either orally, in writing, or through conduct, by both parties.

**B. Wailian Refers Hundreds of Investors to NYCRC Pursuant to the Parties' Contracts, As Modified by Their Subsequent Agreements and Course of Performance**

    i. Brooklyn Navy Yard and Steiner Projects

22. From late 2009 through mid-2010, Wailian and NYCRC successfully collaborated on their first two Projects. First, Wailian recruited 22 investors for the NYCRC's New York City Regional Center Brooklyn Navy Yard Development Fund II, LLC to assist in funding the redevelopment of the Brooklyn Navy Yard. Following Wailian's successful efforts on that project, NYCRC requested Wailian's assistance in recruiting investors for a second project. On or around April 30, 2010, NYCRC created the Brooklyn Navy Yard Transportation and Media Campus Expansion Fund LLC to help fund improvements to the Brooklyn Bridge and improved road access to the Brooklyn Navy Yard and Steiner Studios, for which Wailian recruited 46 investors.

    ii. Arena Project

23. In or about September 2010, Wailian began to recruit investors for the Brooklyn Arena Infrastructure and Transportation Fund, LLC to fund improvements in connection with the construction of the Barclays Center arena (the "Arena Project"). The Arena Project Schedule A guaranteed Wailian 100 investor placements through April 1, 2011, and provided for annual payments of $3,000 per investor per year for five years.

24. The Arena Project Schedule A also purported to set an April 1, 2011 "deadline." However, through their conduct, the parties waived that "deadline," and NYCRC continued to

hold Wailian's allocation open long after the April 1, 2011 deadline had passed. Indeed, through December 2011, NYCRC co-managing principal Paul Levinsohn continued to encourage Wailian to refer investors to the Arena Project and continued to measure Wailian's progress toward the original allocation of 100 investor placements that, by the original terms of the Arena Project Schedule A, would have expired months beforehand, on April 1, 2011.

25.     Additionally, several months after the April 1, 2011 "deadline," Wailian and NYCRC renegotiated the annual payment amount for the Arena Project, increasing it from $3,000 to $4,000 (or 0.8%) per investor per year. On September 4, 2011, Levinsohn wrote to Wailian to confirm that NYCRC would be "raising the [annual] interest payment [for each investor] on Arena Project to .8%," or $4000 (the "September 2011 Amendment"). Then, in January 2012 – more than eight months after the supposed "deadline" – Wailian and NYCRC executed a revised Schedule A for the Arena Project that reflected the increased annual payment amount.

26.     Between October 5, 2010 and April 1, 2011, Wailian referred 58 investors to the Arena Project. Wailian then – with NYCRC's consent – referred an additional 42 investors between April 1, 2011 and the completion of the Project's fundraising efforts in December 2011. NYCRC accepted applications from these 42 additional investors and benefited from the $22,596,000 in additional funds from those investors, for a total benefit to NYCRC of 100 investors and $53,800,000 in investment funds for the Arena Project.

27.     Under the Arena Project Schedule A, NYCRC was obligated to pay Wailian $2,000,000 in annual payments. NYCRC has not, however, paid *any* annual payments, despite

Wailian's continued demands for payment.  As of October 31, 2017, NYCRC owes Wailian $2,000,000 in annual payments on the Arena Project.[1]

       iii.   <u>Waterfront and GWB Projects</u>

28.      After the success of their first three Projects – but before NYCRC refused to pay Wailian – the parties continued to work together.

29.      In early 2011, Wailian began to recruit investors for New York City East River Waterfront Development Fund LLC to help fund the redevelopment of a stretch of waterfront along the East River in Lower Manhattan (the "Waterfront Project").  For the Waterfront Project, NYCRC and Wailian executed a Schedule A that provided for annual payments of $3,000 per year per investor for the next five years.  That Schedule A did not specify any guaranteed allocations or any deadlines.  Between May 19, 2011 and December 26, 2011, Wailian referred 25 investors, who together invested a total of $13,512,500 in the Waterfront Project.

30.      Shortly after the Waterfront Project began, Wailian and NYCRC began collaborating on another project, seeking investment in the George Washington Bridge Bus Station and Infrastructure Development Fund LLC to raise funding to develop a new bus station and retail space at the George Washington Bridge (the "GWB Project").  Like the original Waterfront Project Schedule A, the GWB Project Schedule A also provided for annual payments of $3,000 per year per investor for the next five years and did not set forth any deadlines.  Although neither Schedule A included any deadlines, the GWB Project Schedule A, unlike that of the Waterfront Project, guaranteed Wailian 25 investor placements.

31.      By an email from NYCRC's Levinsohn dated July 18, 2011 (the "July 18, 2011 Email"), NYCRC modified the GWB Project Schedule A's guaranteed allocation, increasing it to

---

[1] A schedule of outstanding payments due to Wailian is annexed hereto as Exhibit A.

7

40 investor placements, and then, a few weeks later, modified it again by emails dated August 4, 2011 (the "August 4, 2011 Email") and August 8, 2011, which increased Wailian's allocation to 70 and then to 80 investor placements, acknowledging Wailian's strong performance and contribution to NYCRC's success.

32. NYCRC modified the GWB Project Schedule A yet again a few months later by an email dated October 30, 2011, this time decreasing Wailian's allocation for the GWB Project to 65 investor placements from the 80 initially promised. NYCRC informed Wailian that the remaining allocations would be transferred to the CBD Project, discussed below.

33. Between March 11, 2011 and December 1, 2011, Wailian referred 65 investors and $35,132,500 to the GWB Project, all of which NYCRC accepted.

34. Under the GWB Project Schedule A, as amended by the September 2011 Amendment, NYCRC was obligated to pay Wailian $1,625,000 in total annual fees for Wailian's work in recruiting 65 investors. NYCRC has not paid any annual fees, despite Wailian's continued demands for payment. As of October 31, 2017, NYCRC owes to Wailian $1,290,000 in annual fees on the GWB Project, plus $335,000 in annual fees coming due between December 2017 and April 2018, for a total of $1,625,000.

35. Further, under the Waterfront Project Schedule A, NYCRC owes Wailian $620,000 in annual fees as of October 31, 2017, with the remaining $5,000 in annual fees coming due in November 2017, for a total of $625,000.

   iv. <u>The September 2011 Amendment and NYCRC's Acknowledgement of Wailian's Right to Annual Payments</u>

36. In the midst of Wailian's performance pursuant to the Waterfront and GWB Project Schedule A's (and its work on the Navy Yard II Project, as discussed below), the parties agreed to the September 2011 Amendment, wherein NYCRC's Levinsohn confirmed that "the

[annual] interest payment will be raised to 1% on all projects after the Arena project to 1%," or $5000, "for all projects after the Arena project." The September 2011 Amendment thus confirmed that the $5000 annual payment applied to each investor Wailian referred in connection with the Waterfront, GWB, Navy Yard II, CBD, and Medical Campus Projects.

37. This increased annual payment amount is reflected in the later-executed CBD and Medical Campus Project Schedule A's. NYCRC also specifically reaffirmed the amount – and Wailian's entitlement to annual payments – more than a year later. In an October 23, 2012 email, Levinsohn expressly agreed that NYCRC would pay Wailian annual payments in the amount of "$5000 per investor for the Waterfront Project . . . on the twelve-month anniversary of each approval," with the first payments to be made in February 2013.

    v.  <u>Navy Yard II Project</u>

38. While Wailian was working to refer investors for the Waterfront and GWB Projects, Wailian also committed to refer investors to the NYCRC Brooklyn Navy Yard Development Fund, LLC, which sought investment to provide additional funding for redevelopment of the Brooklyn Navy Yard (the "Navy Yard II Project").

39. In the July 18, 2011 Email, NYCRC proposed giving Wailian 30 allocations for the Navy Yard II Project, which NYCRC then increased to 42 in the August 4, 2011 Email.

40. NYCRC and Wailian never executed a Schedule A for the Navy Yard II Project. Despite Wailian's repeated requests, NYCRC did not even provide a copy of a draft Schedule A for the Navy Yard II Project until July 2012. It was only then that Wailian learned that the draft Schedule A for Navy Yard II Project had proposed a deadline of December 1, 2011 – seven months prior.

9

41. Wailian did not agree to the December 1, 2011 deadline and continued to refer investors for the Navy Yard II Project through May 2013, which NYCRC accepted. In total, Wailian referred 41 investors, who invested a total of $22,160,500 in the Navy Yard II Project.

42. As of October 31, 2017, NYCRC owes Wailian $815,000 in annual fees for the Navy Yard II Project (as per the amounts set forth in the September 2011 Amendment), plus an additional $210,000 coming due between December 2017 and January 2019, for a total of $1,025,000.

vi. CBD and Medical Campus Projects

43. Wailian's final two projects with NYCRC began in late 2011 and early 2012. As with the previous projects, the parties continued to modify the Schedule A's for these last two projects after execution.

44. Beginning on or around September 28, 2011, Wailian began working to recruit investors for NYCRC's NYC Central Business District Redevelopment Fund, LLC, to fund development of retail space called "City Point" in downtown Brooklyn (the "CBD Project"). In accordance with the September 2011 Amendment, the executed CBD Project Schedule A provided for Wailian to receive an annual payment of $5,000 per investor for five years. It also guaranteed Wailian an allocation of 175 investor placements and purported to set a deadline of March 31, 2012.

45. As with the Schedule A's that preceded it, the CBD Project Schedule A was modified by the parties shortly after its execution. In an October 30, 2011 email, Levinsohn increased Wailian's allocation for the CBD Project to 185 investor placements.

46. Ultimately, Wailian referred 115 investors for the CBD Project. Between September 28, 2011 and March 31, 2012, Wailian fulfilled 54 investor allocations. Between March 31, 2011 and July 2012, Wailian, with NYCRC's consent, referred an additional 61

investors and $32,970,500 of investment to NYCRC for the CBD Project, all of which NYCRC accepted, for a total benefit to NYCRC of 115 investors and $62,157,500.

47.     Under the CBD Project Schedule A, NYCRC was obligated to pay Wailian $2,875,000 in annual fees.  NYCRC has paid no annual fees to Wailian for the CBD Project, despite Wailian's continued demands for payment.  As of October 31, 2017, NYCRC owes Wailian $2,300,000 in annual fees for the CBD Project, plus an additional $575,000 coming due between January 2018 and August 2018, for a total of $2,850,000.

48.     In or about early May 2012, Wailian began its last project with NYCRC, working to refer investors to NYCRC's New York City Medical Campus Development Fund, LLC to help finance development and infrastructure improvement of a commercial area in the Bronx (the "Medical Campus Project").  In accordance with the September 2011 Amendment, the executed Medical Campus Project Schedule A provided for Wailian to receive a $5,000 per investor annual payment for five years.  It also guaranteed Wailian an allocation of 50 investor placements and purported to set a deadline of July 15, 2012.

49.     In appreciation for Wailian's work on the Medical Campus Project to that point, on June 28, 2012, just two weeks before the "deadline," Levinsohn increased Wailian's allocation by 10 investors, which Wailian informed him it could not satisfy before the "deadline."  NYCRC ultimately permitted Wailian to refer investors after that "deadline," accepting investment from 7 additional investors during that time.

50.     Between February 29 and July 15, 2012, Wailian fulfilled 43 investor allocations. Between July 15 and July 25, 2012 – with NYCRC's consent – Wailian continued to procure applications and funds from an additional 7 investors, which NYCRC continued to accept,

obtaining additional investment of $3,783,500, for a total benefit to NYCRC of 50 investors and $27,025,000 for the Medical Campus Project.

51.     NYCRC has not paid any annual fees owed to Wailian for the Medical Campus Project, despite Wailian's continued demands for payment.  As of October 31, 2017, NYCRC owes $975,000 in annual fees for the Medical Campus Project, with an additional $275,000 coming due between November 2017 and August 2019, for a total of $1,250,000 owed to Wailian.

### III. NYCRC ACCEPTS WAILIAN'S PERFORMANCE AND PRAISES ITS EFFORTS, BUT REFUSES TO PAY WAILIAN THE MONIES IT IS OWED

#### A. NYCRC Consistently Expresses Satisfaction with Wailian's Performance

52.     Over the course of the Projects, Wailian and NYCRC remained in constant contact.  For each Project, they corresponded frequently not only about Wailian's progress toward its investor allocations, but also about topics such as advertising to potential investors, including written advertisements and in-person seminars, which NYCRC frequently attended; investor questions; immigration issues; and project-specific details.

53.     At the outset of a given Project, NYCRC would prepare and provide written advertising materials for Wailian's use, which NYCRC would update over the course of the project as necessary.  Then, with NYCRC's approval, Wailian would disseminate the materials provided by NYCRC and organize and finance investor seminars and other investor outreach in China, keeping NYCRC informed of the events, so NYCRC representatives could attend if desired.  NYCRC also provided Wailian with approved communications to be shared with investors over the life of the project, which addressed, for example, project approval delays and other developments.

54. NYCRC regularly and consistently expressed its satisfaction with and approval of Wailian's performance, its appreciation for Wailian's "hard work," and its pride in Wailian's "partnership and friendship." NYCRC also expressed its approval and recognition of Wailian by continually inviting Wailian to participate in NYCRC's next upcoming project as Wailian successfully completed its provisions of investors for a prior project.

55. NYCRC profited handsomely from the Projects, reaping approximately $130 million in comparison to the $9.4 million that Wailian earned. For example, NYCRC earned nearly $18.3 million for itself in connection with the Waterfront Project, while Wailian earned only $625,000. NYCRC thus not only benefited from Wailian's work, but it indisputably had the funds to pay Wailian the monies Wailian had earned.

**B.     Despite Accepting All the Benefits of Wailian's Performance, NYCRC Refuses To Pay the Annual Fees Owed to Wailian**

56. NYCRC's tune abruptly changed, however, when the time came to fulfill its contractual obligations to make annual payments to Wailian.

57. Under the Schedule A's for the Arena Project and all subsequent projects, NYCRC was required to make annual payments to Wailian. For each approved investor, NYCRC was required to pay Wailian on the first five anniversaries of USCIS approval of the investor's green card application, which approval generally came several months after the investor transferred the funds for his or her investment to NYCRC.

58. June 2011 was the very first date that any Wailian-referred NYCRC investor's green card petition was approved by USCIS, and fifteen Arena Project investors' green card applications were approved in June 2011. Accordingly, June 2012 became the first month when NYCRC owed annual payments to Wailian, with $60,000 ($4000/investor x 15 investors) coming due that month.

59. NYCRC acknowledged this commitment by, among other things, including Arena Project annual payments in the income forecasts it provided to Wailian. Further, when Wailian initially asked about the outstanding annual payments due and owing from NYCRC, NYCRC co-managing principal George Olsen explicitly acknowledged Wailian's entitlement to – and NYCRC's obligation to pay – those amounts.

60. On July 24, 2012, however, NYCRC reversed course, taking the position that the "deadlines" in the Schedule A's were binding and to be strictly enforced, and, to the extent not met, negated Wailian's entitlement to *all* annual payments. This about-face was totally inconsistent with NYCRC's prior conduct and its prior representations to Wailian. It also came nearly three years after Wailian and NYCRC began working together – and after NYCRC had already reaped the enormous benefits of Wailian's efforts, with Wailian having fully performed under the Schedule A's for seven Projects and substantially performed under the Schedule A for the parties' eighth (and final) Project together.

61. Additionally, NYCRC made false representations in response to Wailian's repeated requests for payment. Among other false statements, NYCRC's managing principals Paul Levinsohn and George Olsen, represented that NYCRC could no longer pay Wailian because NYCRC had been required to pay additional amounts to the government. Wailian has not been able to confirm the existence, nature, or lawfulness of any such payments. For example, the Port Authority of New York and New Jersey, one of the key government entities involved in the Projects, has no record of NYCRC making any payments to it.

62. NYCRC's refusal to pay Wailian the annual payments that Wailian has earned is a blatant breach of the parties' agreements.

63. Wailian has repeatedly attempted to resolve the issue with NYCRC, both directly and through counsel. Although NYCRC has profited hugely from, and continues to retain the benefits of, Wailian's efforts, it continues to refuse to fulfill its contractual obligations to pay Wailian the amounts owed under the Referral Agreement and the Schedule A's.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

64. Wailian restates each and every allegation of the foregoing paragraphs as if fully set forth herein.

65. The Referral Agreement and the Schedule A's for the Arena, Waterfront, GWB, CBD, and Medical Campus Projects are valid and enforceable agreements, which Wailian has fully performed.

66. Pursuant to the terms of the Schedule A's for the Arena, Waterfront, GWB, CBD, and Medical Campus Projects, NYCRC agreed to pay annual payments for investors referred to NYCRC by Wailian and approved by NYCRC.

67. NYCRC breached these provisions when it failed to make any annual payments under the Schedule A's for the Arena, Waterfront, GWB, CBD, and Medical Campus Projects.

68. NYCRC has not, to date, paid any annual payments to Wailian in connection with the Arena, Waterfront, GWB, CBD, and Medical Campus Projects.

69. As a result of NYCRC's breach, which is continuing as of the date of this Complaint, Wailian has suffered and continues to suffer damages in an amount to be determined at trial, but, in any event no less than $9,400,000, plus applicable interest.

## SECOND CAUSE OF ACTION

## QUANTUM MERUIT

70. Plaintiff restates each and every allegation of the foregoing paragraphs as if fully set forth herein.

71. Wailian fully performed its obligations in connection with the Navy Yard II Project, for which no Schedule A was executed.

72. Additionally, in the alternative to its claim for breach of contract and in the event that NYCRC disputes the applicability and/or enforceability of the Referral Agreement and/or the relevant Schedule A's, Wailian also fully performed its obligations in connection with the Arena, Waterfront, GWB, CBD, and Medical Campus Projects.

73. NYCRC accepted Wailian's services at all times without objection, protest or rejection.

74. The fair and reasonable value of the services that Wailian rendered to NYCRC for the Navy Yard II Project at NYCRC's specific request that remains unpaid is $1,025,000.

75. Additionally, the fair and reasonable value of the other services rendered by Wailian to NYCRC for the Arena, Waterfront, GWB, CBD, and Medical Campus Projects at NYCRC's specific request that remains unpaid is $8,375,000.

76. Despite demands for payment from Wailian to Defendant, these amounts remains outstanding and due from Defendant to Wailian.

77. By reason of the foregoing, and pursuant to the theory of *quantum meruit*, Wailian has been damaged in an amount to be determined at trial, but, in any event, no less than $9,400,000, plus applicable interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

A. For compensatory damages, in an amount to be determined at trial, but no less than $9,400,000;

B. For the costs and expenses of this action, including reasonable attorneys' fees;

C. For pre-judgment interest and post-judgment interest at the maximum rate provided by law; and

D. For such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 17, 2017

/s/ *David E. Ross*
Marc E. Kasowitz
David E. Ross
Danielle R. Gill
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
mkasowitz@kasowitz.com
dross@kasowitz.com
dgill@kaswotz.com

*Attorneys for Plaintiff Wailian Overseas Consulting Group, Ltd.*